IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SHOMAS T. WINSTON,

               Plaintiff,

v.

DAN HUNEKE, LARRY FUCHS,
and COREY RAHLF,

               Defendants.[1]

OPINION and ORDER

18-cv-953-jdp

---

This case arises out of a conduct report that pro se plaintiff and prisoner Shomas T. Winston received while he was incarcerated in New Lisbon Correctional Institution, a prison in Wisconsin. Winston says that defendants Dan Huneke (the supervisor of the psychological services unit), Larry Fuchs (the security director), and Corey Rahlf (a security supervisor) disciplined him because of a grievance Winston filed. Defendants say that they disciplined Winston because he disobeyed an order and tried to solicit female staff members. Because no reasonable jury could find for Winston, I will grant defendants' motion for summary judgment and dismiss the case. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995) ("The test for whether to grant summary judgment is whether, if the record at trial were identical to the record compiled in the summary judgment proceedings, the movant would be entitled to a directed verdict because no reasonable jury would bring in a verdict for the opposing party.").

---

[1] I have amended the caption to reflect Corey Rahlf's full name, as identified in the Department of Justice's acceptance of service form. *See* Dkt. 9.

## UNDISPUTED FACTS

The following facts are undisputed, unless otherwise noted.

In 2015, while Winston was housed at Green Bay Correctional Institution, a female psychologist alleged in an incident report that Winston said to her, "I think about you all the time" and "I am attracted to you." As a result of the allegation, Winston lost his prison job in the psychological services unit but did not receive a conduct report. A few weeks later, the same psychologist wrote an incident report in which she alleged that another prisoner approached her, saying that he had a note from Winston and that Winston believed that the psychologist was "interested" in him. The prisoner did not show the psychologist the note but told her enough about it that she believed it was "solicitous." As a result of that incident, the psychologist added a note to Winston's psychological services file "to alert future treatment providers of his behavior."

In 2016, Winston was transferred to New Lisbon Correctional Institution. In June, Winston saw Dr. Singleton (first name not provided), a male psychologist, for management of stress caused by a finger injury.

In January 2017, Dr. Becerra, a female psychologist, saw Winston twice in response to requests for psychological services. After a third request for an appointment in February 2017, Becerra asked Winston why he was submitting so many requests for services. According to Becerra's notes, Winston said, "I'm not going to lie. I'm surrounded by men all day, so I feel more comfortable talking to females. I'm not going to lie and say that a part of requesting services is not because you're a female, but you have also helped me a lot." According to Winston, he said that Becerra had helped him a lot, "maybe because [her treatment is] from a

woman's perspective." Dkt. 30, ¶ 15. Becerra informed Winston about the boundaries of a therapeutic relationship.

In March 2017, Winston submitted another request for services an received an appointment with Becerra. According to Becerra's notes, Winston said that his request for services was "80% psychological and 20% for other reasons. I'd rather talk to you than them (peers). Also, you're a woman and I feel more comfortable with women." According to Winston, he told Becerra that his request was "80% for the current psychological treatment from her for my hand and 20% for psychological treatment in regards to treatment that doesn't derive from my hand injury." *Id.*, ¶ 16. Becerra concluded that Winston "may be seeking clinical services in order to obtain secondary gain."

On April 5, 2017, Becerra informed Winston that she was referring him to Singleton because of the comments made to her and because of the situation with the female psychologist at the Green Bay prison. On April 15, Winston submitted a request for services directed to both Singleton and Becerra. Winston says that he submitted a request to both psychologists because he wanted "to gain an understanding of what was going on regarding [his] treatment." *Id.*, ¶ 20. Winston received an appointment with Singleton.

On April 24, Winston came to Becerra's office to apologize. According to Becerra's notes, Winston apologized for making "disrespectful comments." According to Winston, he apologized for "some sort of misunderstanding." *Id.*, ¶ 21.

On May 3, Winston came to Becerra's office again. He said that he wanted to speak to her because he was going to be transferred soon. When Becerra told Winston that she had referred him to Singleton, Winston said, "what if it's not related to psychological problems?" Winston left after Becerra told him to submit a request if he needed services.

3

On May 11, Winston submitted a request to be assigned to a psychologist other than Singleton. Winston said that he was "not comfortable speaking with Dr. Singleton," Dkt. 23-1, at 74, but he didn't say why. On May 12, Winston came to Becerra's officer to ask whether his request had been received.

On May 15, Winston submitted another request to be assigned to a psychologist other than Singleton. This time, he said that he was not comfortable because Singleton resembled Winston's stepbrother, who had died in 2010. Defendant Daniel Huneke, the psychological services supervisor, denied the request. He wrote that reassignment would not be appropriate "due to the nature of your issues and a pending transfer" to a different prison.

On May 16, Winston came to Becerra's office and asked to speak to her about "some concerns." She reminded him that he had been reassigned to Singleton.

On May 17, Winston came to Becerra's office again to discuss "some concerns." When Becerra directed Winston to Singleton, Winston said that Singleton reminded him of his deceased brother. He also informed Becerra that he had submitted a request to be reassigned, and he "want[ed] to make sure everything was ok between" him and Becerra. Becerra again directed Winston to speak with Singleton.

On May 18, Winston submitted another request to be assigned to a different clinician. Huneke again denied the request.

On May 19, the unit manager told Winston to stop going into Becerra's office. If he persisted, he could lose his prison job as a unit runner and be transferred to a different unit.[2]

---

[2] The parties don't say what a unit runner is, but apparently the job gave Winston freedom to enter different parts of the prison, including staff offices.

On May 22, Winston went to Becerra's office again and asked her how he could talk to a psychological services supervisor. According to Winston, he asked her this because his job as a unit runner required him to go into the offices of psychological services staff.

On May 23, Winston again asked Huneke to assign him to a different clinician. He wrote that he was not comfortable with Singleton "for more than one reason," but he didn't elaborate. Huneke again rejected Winston's request, writing that Singleton was more appropriate for Winston "due to past issues w/ female staff." Huneke also wrote that he would not address the issue further, but Winston was "free to file a" grievance.

On June 12, Winston submitted a request for an appointment with Dr. Ribble, a female clinician. Ribble instructed Winston to contact Singleton for an appointment.

Around June 16, Huneke sent Winston a memo that included the following language:

> [Y]ou are to discontinue your requests to meet with female PSU staff members. As you have had past problems with staff solicitation and appear to be continuing this pattern at NLCI you will be issued a conduct report for staff solicitation if this continues. Consider this a direct order that you shall not request to meet with female PSU staff and you are to limit any interactions you have with them to only those that are absolutely necessary.

Huneke also sent a copy of the memo to defendant Larry Fuchs, the security director.

Winston responded to Huneke, writing that it was Winston's "understanding [that he] wasn't assigned to Dr. Singleton due to never receiving anything stating this." He also denied having "solicitation situations" in the past. He asked to speak to Huneke. In response, Huneke wrote that he had informed Winston in writing three times that Singleton was his assigned clinician. And he wrote that Winston's "past issues" related to his solicitation of staff at the Green Bay prison in 2015.

On June 19, Winston spoke to Fuchs about Huneke's memo. Winston alleges that "Fuchs told [him] in a warning manner not to file a complaint against Huneke."

On July 12, Winston filed a grievance, alleging that Huneke was "harass[ing]" him by threatening to give him a conduct report. The grievance was denied at every level.

Winston alleges that he saw Huneke in the library between July 13 and 16, and that Huneke said to him, "you shouldn't have filed" a grievance.

Winston alleges that, on July 17, a grievance examiner directed him to contact psychological services "to rectify the situation."

On July 17, Winston sent a request for services to Becerra. He wrote, "I never disrespected you or anything and am/was comfortable seeing you. Can you please intervene somehow by having me assigned back to you to show [the grievance examiner] the issue is cleared up and set up appointment to address a few stress related issues?" Huneke intercepted the request and again informed Winston that Singleton was his assigned clinician.

On July 18, Huneke issued Winston a conduct report for attempting to contact Becerra through a services request. Huneke cited rules against "disobeying orders" and "soliciting an employee." Winston was placed in temporary lockup pending a decision on the conduct report. Defendant Corey Rahlf, a security supervisor, escorted Winston to temporary lockup. When Winston accused Huneke of retaliating against him, Rahlf said, "be careful about the words you use towards staff" or "be mindful of statements made outside the inmate complaint process."

The conduct report was sent to Fuchs for a determination whether it would proceed as a major or minor offense or be dismissed. Solicitation of an employee is designated as a major

offense under Wis. Admin. Code § DOC 303.71(2), so Fuchs allowed the conduct report to proceed as a major offense.

On August 2, Rahlf presided over Winston's disciplinary hearing, along with someone else identified by the parties only as "Goodman." Rahlf approved all of Winston's requests for witnesses, including Huneke and Becerra. During the hearing, Winston admitted that he understood Huneke's order not to contact female psychological services staff and that he disobeyed the order.

Rahlf and Goodman found that Winston had both disobeyed an order and solicited an employee. The decision states: "[H]e repeatedly attempt[ed] to meet with and be seen by a female clinician . . . . The accused has been shown to continual[ly] request special attention of a female employee." As a result, Winston was placed in disciplinary separation for 30 days.

ANALYSIS

Winston must prove three things to prevail on his retaliation claim: (1) he was engaging in activity protected by the Constitution; (2) defendants' conduct was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) defendants subjected Winston to adverse treatment because of his constitutionally protected activity. *See Hughes v. Scott*, 816 F.3d 955, 956 (7th Cir. 2016); *Gomez v. Randle*, 680 F.3d 859, 866–67 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 555–56 (7th Cir. 2009).

As for the first element, Winston says that his protected conduct is the grievance he filed on July 12, 2017, in which he complained that Huneke was threatening to give him a conduct report. There is a strong argument that the July 12 grievance was frivolous and therefore not constitutionally protected. *See Perez v. Fenoglio,* 792 F.3d 768, 783 (7th Cir. 2015)

("[F]iling a *non-frivolous* grievance is a constitutionally protected activity sufficient to support a retaliation claim.") (emphasis added); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (filing frivolous grievance not protected by the First Amendment).

It is obvious that Huneke was not "harassing" Winston by threatening to give him a conduct report for continuing to contact female psychological services staff. As the grievance examiner explained, Winston provided "no information that would support any staff misconduct, harassment or work rule violations on the part of staff. The inmate is merely pointing out actions by PSU Supervisor Huneke that he does not agree with or like." Dkt. 23-4, at 6. But defendants do not press this point, so I will not dismiss the case on this ground. I will also assume that placement in segregation for 30 days would deter a reasonable person in Winston's circumstances from exercising his rights and thus satisfies the second element of a retaliation claim. *See Jackson v. Thurmer,* 748 F. Supp. 2d 990, 1003 (W.D. Wis. 2010) (45 days in disciplinary segregation is a sufficient injury to state First Amendment retaliation claim).

The third element has two parts. It is Winston's burden to prove that his constitutionally protected conduct was a "motivating factor" in the decision to discipline him. *Harnishfeger v. United States*, 943 F.3d 1105, 1122 (7th Cir. 2019). If Winston meets his burden, defendants must show that they would have disciplined Winston even if he hadn't engaged in protected conduct. *Id.* Winston's claim fails on this element.

The evidence supporting the conduct report for disobeying orders and soliciting an employee was overwhelming. Winston *admitted* at the disciplinary hearing that he disobeyed Huneke's order not to contact female psychological services contact. And the undisputed facts show that he did. Huneke's memo couldn't have been clearer: "[T]his a direct order that you shall not request to meet with female PSU staff and you are to limit any interactions you have

with them to only those that are absolutely necessary." Despite this "direct order," Winston sent Becerra a request for services less than a month later, asking her to "please intervene somehow by having [Winston] assigned back to [Becerra] to show [the grievance examiner] the issue is cleared up and set up appointment to address a few stress related issues."

Winston tries to justify his conduct, stating that he believed that Huneke's order was "waived" because "inmate complaint staff" directed Winston to contact psychological services staff "to try to rectify the situation." Dkt. 30, ¶¶ 44–45. Winston's account of the reason he violated Huneke's order isn't persuasive. Even if staff told him to contact the psychological services unit, he doesn't identify any reason he needed to contact Becerra specifically. More important, whether Winston believes he had a good reason for disobeying Huneke is irrelevant. Winston must point to evidence that Huneke gave him a conduct report at least in part because of the grievance he filed. In other words, Winston must show what *Huneke* believed; it simply doesn't matter what *Winston* believed. Winston cites no evidence that Huneke believed it was permissible for Winston to send another request for services to Becerra, so Winston can't support his claim with an allegation that he subjectively believed that he wasn't doing anything wrong. *See Simpson v. Beaver Dam Cmty. Hospitals, Inc.,* 780 F.3d 784, 794 (7th Cir. 2015) ("[A] plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact." (internal quotation marks omitted)).

There was also ample evidence to support the violation for soliciting an employee, which is defined broadly to include "requests [for] special attention of an employee." Wis. Admin. Code § DOC 303.30(6). That evidence includes the following:

- In February 2017, Becerra wrote in her notes that Winston stated that "a part of" Winston's reason for requesting psychological services is that he is "surrounded by men all day" and Becerra is a woman.

9

- In March 2017, Becerra wrote in her notes that Winston stated that his request for services was "80% psychological and 20% for other reasons" and that Becerra is "a woman and I feel more comfortable with women."

- On May 3, Winston came to Becerra's office after he was reassigned to Singleton. When Becerra told Winston that she was no longer his therapist, Winston said, "what if it's not related to psychological problems?"

- On May 17, he came to Becerra's office, telling her that he "want[ed] to make sure everything was ok between" him and Becerra.

- On June 12, after being told repeatedly that Singleton was his assigned clinician, Winston sent a request for services to another female clinician.

- After Winston was informed that Becerra was no longer his clinician, he came to her office to speak to her on April 23, May 3, May 11, May 16, May 17, and May 22.

- After deciding that she could no longer treat Winston, Becerra concluded that Winston may have been requesting services to obtain secondary gain.

- Winston was told by multiple staff members before he was disciplined to stop seeking reassignment and to stop visiting Becerra's office.

- In July, after being warned that he would receive a conduct report if he continued contacting female psychological services staff, Winston sent Becerra a request for an appointment and asked her to intervene on his behalf.

The conduct summarized above goes beyond just seeking special attention from staff; it borders on harassment, if not stalking. Winston repeatedly contacted Becerra after she was no longer his assigned clinician, even when Becerra repeatedly redirected Winston to Singleton, and even when Winston was told to stop by multiple staff members. On at least one occasion, Winston tried to engage Becerra in conversation having nothing to do with his mental health needs. The mountain of evidence compiled by prison staff was more than enough to support a finding that Winston was requesting special attention from female employees.

Again, Winston attempts to explain away his conduct and make excuses for himself. First, he disputes the accuracy of Becerra's notes regarding the statements he made to her. But

10

any dispute is immaterial. *See Montgomery v. American Airlines, Inc.,* 626 F.3d 382, 389 (7th Cir. 2010) ("[D]isputed facts that are not outcome determinative are not material and will not preclude summary judgment."). Winston doesn't identify any motive for Becerra to lie, and defendants were not required to believe Winston over Becerra. *Wilson v. Greetan*, 571 F. Supp. 2d 948, 955 (W.D. Wis. 2007) (A hearing officer "is not required to believe the prisoner in every instance or face liability for violating the prisoner's constitutional rights."). And even without Becerra's notes, Winston's undisputed conduct is sufficient to support a finding that Winston was seeking special attention from Becerra.

Second, Winston states repeatedly throughout his summary judgment filings that his conduct report was based on a false premise that he had received a conduct report for soliciting an employee at the Green Bay prison. *See, e.g.*, Dkt. 27, at 15, 17; Dkt. 30, ¶ 61; Dkt. 39, ¶ 18. But he cites no evidence suggesting that any of the defendants accused him of having received previous conduct reports for soliciting an employee. Rather, they referred to allegations made by another female clinician that Winston told her, "I think about you all the time" and "I am attracted to you." Winston seems to believe that prison staff may not consider a prisoner's past behavior unless he received a conduct report for that behavior, but he cites no authority for that view.

In any event, Winston cites no evidence that defendants disciplined him for anything that happened at Green Bay in 2015. Although it is true that Becerra and Huneke were more concerned about Winston's behavior because it appeared to be a part of a pattern, the punishment he received was for disobeying an order in 2017 and soliciting an employee in 2017. Even if Winston's previous clinician fabricated the allegations again him, that would not

invalidate his 2017 conduct report or provide evidence that defendants retaliated against him for filing a grievance.

Third, Winston says that defendants disregarded evidence that he was not *always* requesting services from female psychological staff specifically. Rather, sometimes he was requesting to see any clinician other than Singleton. The parties do not say whether any of the other clinicians at the prison were male, so I do not know whether excluding Singleton would inevitably result in an appointment with a female clinician. But even if there were other male clinicians to which Winston could have been assigned, this is another irrelevant point. Defendants don't have to prove that Winston's sole purpose in seeking psychological services was to spend time with female staff. So even if Singleton was willing to accept a male clinician, it doesn't detract from all the evidence showing that Winston was requesting special attention from female staff.

Fourth, Winston quibbles with the way that Rahlf conducted the disciplinary hearing. He says that Rahlf didn't allow him to present all the evidence he wanted and that Rahlf disregarded inconsistencies in Becerra's testimony. But Winston doesn't identify the evidence he was unable to present. And the only "inconsistency" he identifies is that Becerra testified that "he never made of any mention of attraction [to Becerra] however things he was doing were identical to the same nature and behaviors he was doing with the [clinician] at GBCI." Dkt. 21-1, at 7. Winston says that his behavior could not be "identical" if, as Becerra acknowledged, he never told Becerra that he was attracted to. Becerra's use of the word "identical" may have been clumsy, but Winston doesn't point to any specific facts that she misrepresented. In any event, the purpose of this case is not to relitigate Winston's disciplinary

12

hearing. Winston points to nothing about the process that suggests that Rawlf had a retaliatory motive.

Fifth, Winston cites the declaration of Rafael Perez, who says that he was a prisoner at the New Lisbon prison in 2016, that he received a conduct report for soliciting female staff, and that he was allowed to see female psychological services staff despite his conduct report. Dkt. 31. Winston relies on the declaration to show that he was treated less favorably than similarly situated prisoners, which can be evidence of a discriminatory motive. *See Perez v. Thorntons, Inc.,* 731 F.3d 699, 704 (7th Cir. 2013). But Perez isn't similarly situated to Winston. As an initial matter, Perez doesn't explain the circumstances surrounding his conduct report and he doesn't say whether Huneke knew about his conduct report, so Winston hasn't shown that Perez's situation has any probative value.

More important, Winston is again focusing on the wrong issue. Perez's declaration could be relevant only if Winston were suing defendants for refusing to allow him to see a female clinician because of his conduct in 2015. But that's not what this case is about. Winston was allowed to continue seeing female clinicians despite the 2015 allegations. The question in this case is whether Huneke, Fuchs, and Rahlf disciplined Winston for filing a grievance rather than for violating prison rules. Perez's declaration sheds no light on that question. Winston points to no other prisoner who engaged in conduct similar to what he did in 2017 but wasn't disciplined. *See Weber v. Universities Research Ass'n, Inc.,* 621 F.3d 589, 594–95 (7th Cir. 2010) ("[I]n disciplinary cases a plaintiff must show that [he and the comparator] dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.").

If this were all of Winston's evidence, I would dismiss the case as frivolous and record a "strike" under 28 U.S.C. § 1915(g). But Winston also alleges that defendants made suspicious statements. Specifically, Winston avers in his declaration that: (1) "Fuchs told me in a warning matter not to file a complaint against Huneke," Dkt. 30, ¶ 40; (2) Huneke stated, "you shouldn't have filed an ICE [grievance]," *id.*, ¶ 51; and (3) "Rahlf [used] words to the effect of 'be careful about the words you use toward staff," *id.*, ¶ 53. When screening the complaint, I allowed Winston to proceed because of those alleged statements. Dkt. 7. I cited *Thomas v. Anderson,* 912 F.3d 971 (7th Cir. 2018), another retaliation case brought by a prisoner. The court concluded that the prisoner had adduced sufficient evidence to create a genuine issue of material fact that the defendants retaliated against the prisoner for filing a grievance, citing alleged statements such as "You should have thought about that before you made all of [your] complaints about me and filing grievances about me in the prison" and "[You] shouldn't have been making complaints about the prison." *Id.* at 973–75.

The alleged statements by the defendants in this case were enough to satisfy liberal pleading standards and they are enough now to avoid a finding that the case is frivolous, but they aren't enough to defeat defendants' motion for summary judgment. For one thing, the alleged statements in this case are more ambiguous than the statements in *Thomas*. Winston provides little or no factual context for any of the defendants' alleged statements, so they have less probative value. And the alleged statement by Huneke makes little sense. It is undisputed that Huneke *encouraged* Winston to file a grievance if he wished to challenge Huneke's decision, so why would Huneke be angry when Winston accepted the invitation? Also, nearly all the critical facts were disputed in *Thomas*. The prisoner had received a conduct report for resisting, making threats, being insolent, and disobeying a direct order, all of which the prisoner denied.

14

*Id.* at 974. In this case, much of the evidence supporting the violations of prison rules is undisputed.

Even if the alleged statements would be enough to show that defendants were displeased with Winston for filing a grievance, I have no difficulty in concluding as a matter of law that defendants would have taken the same actions even if Winston hadn't filed a grievance. As discussed above, the grievance was frivolous, and it was denied at each administrative level. It would have been apparent to defendants that they would not face any consequences as a result of the grievance.

More important, the evidence against Winston was so strong that it is simply not reasonable to infer that his grievance made any difference to the outcome of the disciplinary proceedings. *See Taylor-Novotny v. Health Alliance Medical Plans, Inc.,* 772 F.3d 478, 495–96 (7th Cir. 2014) (plaintiff's evidence of retaliation "must be evaluated in the context of the whole record"). Again, Winston admitted that he disobeyed an unambiguous order from Huneke. And the undisputed facts show that Winston was requesting special attention from female staff members. Despite all his excuses and attempts to minimize his misconduct, Winston doesn't explain how the defendants could have reached any other decision. And he doesn't cite any evidence that he received a harsher punishment than similarly situated prisoners.

Under these circumstances, no reasonable jury could find that any of the defendants retaliated against Winston for filing a grievance. I will grant defendants motion for summary judgment and close the case.

ORDER

IT IS ORDERED that the motion for summary judgment filed by Larry Fuchs, Dan Huneke, and Corey Rahlf, Dkt. 18, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered April 1, 2020.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge